IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| DET DALLAS CLINICS, LLC and TREND PHYSICIANS GROUP, INC., | § § | Case No. 26-35975 (Jointly Administered) |
| | § | |
| Debtors. | § | **Jeffrey P. Norman** |
| | § | |

**DECLARATION OF DEREK GOVE IN SUPPORT OF CREDITORS' MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND RELATED MOTIONS**

I, Derek Gove, pursuant to 28 U.S.C. § 1746, declare as follows:

## I. INTRODUCTION AND QUALIFICATIONS

1. My name is Derek Gove. I am over the age of eighteen and am competent to make this declaration. I reside at 4351 Stonewood Circle, Midlothian, Texas 76065, in the Dallas–Fort Worth Metroplex area.

2. I am the Managing Partner of TED Ventures, LLC ("TED Ventures"). TED Ventures is owned by me and my partners, Trey Austin and Enrique Stowhas. TED Ventures is the sole legal and beneficial owner of all issued and outstanding membership interests in Trend Medical Management, LLC ("TMM").

3. I am a healthcare executive with approximately fifteen years of experience in consulting, distribution, team building, turnarounds, mergers and acquisitions, and operational excellence in the healthcare industry.

4. I have personal knowledge of the facts stated in this declaration and am competent to testify to them. If called as a witness, I would testify consistently with the statements made herein. Where noted, certain facts are stated upon information and belief based

on documents and testimony obtained through discovery in the state-court litigation described below.

5. I submit this declaration in support of the following motions filed by TED Ventures, LLC and Trend Medical Management, LLC ("Creditors") in these jointly administered bankruptcy cases:

a. Motion to Transfer Venue Under 28 U.S.C. § 1412 and Federal Rule of Bankruptcy Procedure 1014;

b. Motion for Appointment of a Chapter 11 Trustee Under 11 U.S.C. § 1104(a) or in the Alternative, Conversion to Chapter 7;

c. Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362(d) to Continue the State-Court Litigation;

d. Motion for Examination Under Federal Rule of Bankruptcy Procedure 2004; and

e. Motion for Expedited Consideration and Consolidated Hearing.

## II.
## THE MEDICAL MANAGEMENT BUSINESSES

6. TMM provided management, administrative, and related business services to physicians and medical practices. TMM was the vehicle through which my partners and I built and operated our healthcare businesses in the Dallas–Fort Worth area.

7. In December 2023, TMM was the sole member of Trend Physicians Group, Inc. ("TPG"). TPG is a Texas nonprofit corporation, certified as a health organization by the Texas Medical Board, rendering professional medical services through licensed employees and independent contractors.

8. The businesses operated six clinics in the Dallas–Fort Worth Metroplex under the name Advanced Healthcare Clinics, located in Plano, Hurst, Mesquite, Buckner, South Dallas,

and Denton, Texas. All operations were concentrated in the DFW area. None of the clinics or operations were located in Houston.

## III.
## THE APCA TRANSACTION — DECEMBER 12, 2023

9. On December 12, 2023, TMM, Zoo Capital Holdings, LLC ("Zoo Capital"), and AD Dallas Clinics, LLC ("AD Dallas," now known as DET Dallas Clinics, LLC) entered into an Asset Purchase and Contribution Agreement (the "APCA").

10. Under the APCA, TMM contributed, assigned, transferred, and conveyed to Zoo Capital substantially all of TMM's assets, including TMM's ownership interest in TPG (the "Contributed Assets"). Zoo Capital subsequently contributed the Contributed Assets down to AD Dallas.

11. The Contributed Assets were valued at over $13 million by the parties and by VMG, the buyer's own third-party valuation consultant.

12. The agreed purchase price under the APCA was $12 million, payable in three components:

a. Base Cash Consideration of $3,000,000, due at closing;

b. A Subordinated Promissory Note in the principal amount of $3,000,000, payable quarterly, with AD Dallas as maker and TMM as payee, bearing interest at the applicable federal rate of 5.16%; and

c. Rollover Securities valued at $6,000,000, to be issued to Creditors by Zoo Capital Holdings, LLC, defined in the APCA as "Parent," and not by AD Dallas.

13. Contemporaneously with the APCA, the parties executed a Security Agreement (with AD Dallas as debtor and TMM as secured party), granting TMM a security interest in accounts receivable with a $15 million collateral cap, evidenced by an executed UCC-1 financing statement. The parties also executed a Bill of Sale, Assignment, and Assumption Agreement.

14. Section 8.12 of the APCA provides that venue for any dispute arising under the agreement is fixed in Dallas County, Texas.

15. In connection with the transaction, I, along with Trey Austin and Enrique Stowhas, also entered into employment agreements dated November 1, 2023 with AD Dallas, which were later assigned to Cognizant Management Solutions, LLC, the entity that issued our paychecks. Under those agreements, I was employed as Chief Executive Officer, Austin as Chief Financial Officer, and Stowhas as Chief Marketing Officer. Our employment was terminated in April 2025 when the litigation began, and none of us holds any officer, director, or management position with either debtor. Each employment agreement also contained a venue provision fixing jurisdiction in Dallas County, Texas.

## IV.
## DEFENDANTS' FAILURE TO PAY

16. Creditors performed their obligations under the APCA in full. We contributed our medical care businesses, clinics, employees, patient relationships, and operations exactly as agreed.

17. The $3 million Base Cash Consideration was not paid at closing. Defendants represented that they would pay $1 million each in January, February, and March 2024.

18. Checks delivered by defendants were dishonored for insufficient funds, resulting in approximately $750,000 in returned items. The bounced checks damaged Creditors' banking relationships.

19. After making two quarterly payments on the Subordinated Promissory Note, the payment account was left without funds by reason of other payments and transfers authorized by Atul "Lucky" Chopra, and payment ceased. As a result, the full Note balance was accelerated in accordance with its terms.

20. The $6 million in Rollover Securities was never issued or delivered to Creditors. Under Section 2.05 of the APCA, that obligation was Zoo Capital's, not the debtors'.

21. In sum, Creditors contributed assets worth more than $13 million and received virtually nothing of the agreed $12 million purchase price.

22. Transaction damages total not less than $9,208,849, consisting of: $708,849 in unpaid Base Cash Consideration (after credits for amounts actually received), $2,500,000 in accelerated Note principal, and $6,000,000 in undelivered Rollover Securities, plus accrued interest and consequential damages.

## V.
## CHOPRA'S CONTROL AND CORPORATE STRUCTURE

23. Atul "Lucky" Chopra personally owns and controls Zoo Capital Holdings, LLC, a non-debtor entity.

24. The corporate chain is as follows: Chopra owns Zoo Capital (non-debtor), which holds 100% of the equity of DET Dallas Clinics, LLC (f/k/a AD Dallas Clinics, LLC) (debtor), which in turn owns 100% of TPG (debtor). The two solvent links in the chain — Chopra and Zoo Capital — did not file for bankruptcy.

25. Based upon my personal knowledge as former CEO of AD Dallas and upon information obtained through the state-court litigation, including the deposition testimony of Steven Ryan Reneau (former Executive Vice President and Chief Financial Officer of the Advanced Diagnostics group), Chopra exercised sole and final payment authority over every entity in the corporate group. He decided what was paid and what was not, directed treasury personnel to pull funds from whichever entity had them, and permitted no cash-control system.

26. AD Dallas (now DET), the maker of the $3 million Subordinated Promissory Note, was purely an acquisition entity. It had no employees, no bank account, no billing

operations, and no revenue of its own. It was never capitalized to perform any of the obligations it undertook under the APCA.

27. Zoo Capital had no bank account of its own and held assets insufficient to satisfy the obligations it undertook.

28. Upon information and belief based on discovery in the state-court litigation, company funds were moved among and out of the entities with no documentation beyond journal entries — no promissory notes, no intercompany agreements, no interest, and no repayment terms — and were applied to Chopra's private ventures, including restaurant and real-estate entities having no connection to the medical practice operations.

## VI.
## THE MERRILL LYNCH ACCOUNT AND AVAILABLE FUNDS

29. Upon information and belief, based on documents produced in the state-court litigation and the deposition testimony of Steven Ryan Reneau, the Chopra group maintained a Merrill Lynch investment account (No. 23V-02863), titled in the names of Cognizant Management Solutions, LLC and Advanced Diagnostics Health System, LLC, at 1911 Bagby Street, Houston, Texas.

30. That account held approximately $11.27 million as of September 29, 2023 and approximately $9.85 million as of December 29, 2023.

31. Chopra alone controlled that account. The group's own Chief Financial Officer, Steven Ryan Reneau — the former CFO of the Zoo Capital entities — had no access to it and was required to ask Chopra to have Merrill Lynch furnish a statement so the auditors could close the audit. This testimony was given by Mr. Reneau in his deposition taken on July 7, 2026 in the state-court action, and is corroborated by business records produced in that litigation.

32. The audited financial statements of the group report cash and cash equivalents of $5,659,475 as of December 31, 2023 — more than sufficient to pay the $3 million Base Cash Consideration, which Chopra chose not to pay.

## VII.
## FACTORING OF RECEIVABLES AND STRIPPING OF COLLATERAL

33. Under the Security Agreement executed contemporaneously with the APCA, $15 million of accounts receivable were to serve as collateral securing the obligations owed to Creditors, as evidenced by an executed UCC-1 financing statement. In November 2023, Chopra personally showed me approximately $47 million in available receivables from which he stated the $15 million of collateral would be reserved.

34. Upon information and belief, based on documents produced in the state-court litigation, on or about December 28, 2023 — only sixteen days after the APCA closing — Chopra personally signed documents factoring approximately $47 million in receivables to a third party for approximately $6.1 million in immediate cash.

35. Instead of preserving the collateral pledged to Creditors, Chopra converted the receivables to cash at a steep discount and diverted the proceeds to other uses.

36. At each subsequent factoring date, the receivables were again factored elsewhere rather than preserved as the collateral pledged to Creditors under the Security Agreement.

## VIII.
## UNDOCUMENTED INTERCOMPANY TRANSFERS

37. Upon information and belief, based on documents produced in the state-court litigation, as of fiscal year-end 2023, the operating entities' own books recorded $29,142,894.89 in intercompany payables to entities Chopra controls outside the operating group.

38. These transfers were largely undocumented — no loan agreements, no promissory notes, no board resolutions, no interest, and no repayment terms.

39. Among these, $15,798,654.68 flowed from Cognizant Management Solutions, LLC (the entity that issued Creditors' paychecks) to Chopra Imaging Centers, Inc. — an entity whose own bank account reflected a single transaction of $25.00 across December 2023 and January 2024.

40. Funds were further diverted to Chopra's personal restaurant ventures and real-estate entities, none of which have any connection to the medical practice operations.

## IX.
## POST-CLOSING SERVICES OWED

41. Separate from the APCA, TED Ventures and TMM continued to provide management services to TPG and workers' compensation billing services to defendants' affiliated facilities after the closing of the APCA transaction.

42. These services were invoiced monthly in the ordinary course of business.

43. Defendants accepted the services and invoices without contemporaneous dispute and failed and refused to pay.

44. The unpaid balance for post-closing services is $314,009.83, consisting of management fees of $205,894.45 and workers' compensation billing services of $70,450.30, $23,295.33, $13,112.22, and $1,257.53.

## X.
## THE STATE-COURT LITIGATION AND EVE-OF-TRIAL BANKRUPTCY FILING

45. In April 2025, Creditors filed suit in the 162nd Judicial District Court of Dallas County, Texas, Cause No. DC-25-05848.

46. The litigation spanned over sixteen months, including depositions, extensive discovery, multiple trial settings, and continuances. A related action is also pending in Ellis County, Texas, Cause No. 120138, in the 40th Judicial District Court.

47. Trial was set for August 17, 2026 — the third trial setting in the case.

48. On August 14, 2026 — the last business day before trial — AD Dallas Clinics, LLC changed its name to DET Dallas Clinics, LLC and filed a Chapter 11 petition in this Court (Case No. 26-35975). On the same day, TPG also filed a Chapter 11 petition (Case No. 26-35976). Both petitions were filed by Susan Tran Adams of Tran Singh, LLP, Houston, Texas.

49. The filings triggered the automatic stay under 11 U.S.C. § 362(a) and halted the state-court proceedings on the eve of trial.

50. The name change from "AD Dallas Clinics" to "DET Dallas Clinics" on the very day of the bankruptcy filing appears to have been intended to obscure the entity's connection to the state-court litigation and make it more difficult for Creditors to locate the bankruptcy case.

51. Both debtors initially elected Subchapter V treatment despite sworn liabilities of $10 million to $50 million, and both left the debt-limit certification box unchecked on Official Form 201. The debtors have since amended their petitions to remove the Subchapter V election.

52. DET's Official Form 204 schedules $10,200,000 in claims held by five creditors: TED Ventures ($3,400,000), TMM ($3,400,000), Gove ($1,133,333), Austin ($1,133,333), and Stowhas ($1,133,333). DET lists no other creditors.

53. TPG's Official Form 204 schedules approximately $10,800,000 in claims. The five Creditors' claims total approximately $10,500,000, plus approximately $308,000 in trade debt.

54. None of the Creditors' claims is marked as contingent, unliquidated, or disputed on Official Form 204 — despite the fact that defendants contested these very claims for sixteen months in state court.

55. On August 20, 2026, the state court entered a severance and abatement order addressing the claims against the debtor entities and the claims against Chopra and Zoo Capital, as described in Section XII below.

## XI.
## THE STATE-COURT LITIGATION WAS FULLY DEVELOPED AND TRIAL-READY

56. Creditors filed suit in April 2025 in the 162nd Judicial District Court of Dallas County, Texas, Cause No. DC-25-05848, and actively prosecuted that case for more than sixteen months.

57. Discovery in that case closed on February 20, 2026. Discovery is fully complete, and no further discovery is required for trial.

58. Depositions were taken of me, Trey Austin, and Enrique Stowhas in October 2025; of Atul "Lucky" Chopra and Steven Ryan Reneau in July 2026; of Mark Lipman on June 11, 2026; and of Turner, Creswick, and Craig King. I was personally deposed, and I either attended the remaining depositions or was informed of their substance by counsel.

59. Upon information and belief, based on counsel's records of the state-court proceedings, the parties exchanged expert designations, and defendants designated JTaylor & Associates as their expert in November 2025.

60. Upon information and belief, based on counsel's records of the state-court proceedings, trial briefs were filed; witness and exhibit lists were exchanged; proposed findings

of fact and conclusions of law were filed; a joint proposed pretrial order was completed; premarked trial exhibits were prepared; and trial subpoenas were issued.

61. Upon information and belief, based on counsel's records of the state-court proceedings, the only witnesses the defendants disclosed in discovery in the state-court action, and the only witnesses they could therefore have called at the August 2026 trial setting, were Atul "Lucky" Chopra, Turner, me, Trey Austin, and Enrique Stowhas. The witness list the Debtors have submitted in these bankruptcy cases identifies additional persons who were never disclosed in discovery in the state-court action.

62. The case had three trial settings and was set for its third setting on August 17, 2026. As of that date, the case was trial-ready.

63. The Debtors filed their bankruptcy petitions on August 14, 2026, the last business day before that trial setting.

64. On the same day it filed its petition, AD Dallas Clinics, LLC changed its name to DET Dallas Clinics, LLC.

## XII.
## THE AUGUST 20, 2026 SEVERANCE AND ABATEMENT ORDER

65. Upon information and belief, based on the order itself and counsel's records, on August 20, 2026 the state court entered an order that: (a) determined the defendants' notice of removal was void; (b) severed all claims against DET and TPG, and their counterclaims, into a separate cause; (c) abated the severed cause pending termination of or relief from the automatic stay; (d) allowed the original cause to proceed against Chopra and Zoo Capital; and (e) provided that any amounts recovered in the bankruptcy cases are credited dollar-for-dollar against any state-court judgment.

66. The severed cause is ready to proceed immediately upon relief from the automatic stay. No additional pleadings, discovery, or pretrial preparation would be required.

**XIII.**
**RELIEF FROM THE STAY WOULD NOT PREJUDICE THE ESTATES**

67. Creditors seek only to liquidate their claims in the state-court forum. Creditors do not seek to execute against property of the estates, and any judgment obtained would be presented to this Court for allowance and distribution.

68. DET has no scheduled creditors other than the five creditors represented by Creditors' counsel. No other creditor of DET could be affected by continuation of the state-court case.

69. TPG's other creditors hold approximately $308,000 in trade debt against approximately $10.8 million in scheduled claims. Creditors' claims comprise substantially all of the scheduled debt in both cases.

70. DET reports estimated assets of $0 to $50,000 against liabilities exceeding $10 million, and it has no employees, no bank account, and no operations. There is no reorganization effort that continuation of the state-court case could disrupt.

**XIV.**
**DET IS A NON-OPERATING SHELL**

71. DET's own amended petition reports estimated assets of $0 to $50,000 against liabilities exceeding $10 million.

72. DET has no employees, no bank account, no billing operations, no revenue, no patients, and no business operations of any kind. It was created solely as an acquisition entity to hold downstream assets in the APCA transaction and was never capitalized.

73. There is no going concern to reorganize.

## XV.
## VENUE BELONGS IN THE NORTHERN DISTRICT OF TEXAS

74. The APCA transaction closed in Dallas County, Texas. Section 8.12 of the APCA expressly fixes venue for any dispute arising under the agreement in Dallas County.

75. The employment agreements between Creditors and AD Dallas also fix jurisdiction in Dallas County, Texas.

76. All six clinics operated by TPG are located in the DFW Metroplex: Plano, Hurst, Mesquite, Buckner, South Dallas, and Denton. None is in Houston.

77. I recently relocated to East Texas and continue to maintain offices in Midlothian, Texas (Ellis County, in the DFW area). Trey Austin resides in Irving, Texas. Enrique Stowhas resides in Dallas, Texas.

78. The state-court litigation was pending in Dallas County, Texas. The related removed federal case is now pending in the Northern District of Texas, Case No. 3:26-cv-02783-E, before Judge Ada Brown.

79. TPG's trade creditors are concentrated in the DFW Metroplex.

80. The only Houston connections are the 1911 Bagby Street address — which is Zoo Capital's office, not a clinic — and Tran Singh LLP, debtors' counsel.

81. Defendants' own state-court pleadings described AD Dallas Clinics' principal place of business as Dallas County, Texas, directly contradicting the Houston bankruptcy petition.

## XVI.
## THE DIP HAS AN IRRECONCILABLE CONFLICT OF INTEREST

82. The debtor-in-possession is controlled by Chopra, the very person whose conduct gives rise to Creditors' claims and the potential estate causes of action.

83. Chopra cannot and will not cause DET or TPG to sue Chopra or pursue alter-ego claims against his own affiliates, including Zoo Capital.

84. The estates hold potential avoidance claims under 11 U.S.C. §§ 544, 547, and 548 arising from the $29 million in undocumented intercompany transfers, the $47 million receivables factoring, and diversions to Chopra's personal ventures.

85. These claims will never be pursued under current DIP management because Chopra controls both debtors.

86. A demand letter has been sent to the debtors through their counsel, Susan Tran Adams, demanding investigation and pursuit of these estate causes of action. To date, no response has been received.

## XVII.
## NEED FOR RULE 2004 EXAMINATION

87. Creditors seek to examine Walker Robertson (DET's Vice President of Finance), Rebecca Warfield (TPG's Secretary), Atul "Lucky" Chopra, Steven Ryan Reneau (former Executive Vice President and Chief Financial Officer of the Zoo Capital entities, including Cognizant Management Solutions, LLC and Advanced Diagnostics Health System, LLC), and a Zoo Capital Holdings, LLC corporate representative designated under Federal Rule of Civil Procedure 30(b)(6). Mr. Reneau has direct knowledge of the intercompany transfers, the control of the group's bank and investment accounts, the factoring of receivables, and the capitalization of DET.

88. The examination is needed to investigate pre- and post-petition financial transactions, intercompany transfers, capitalization, control of bank accounts, factoring transactions, use of funds, and DIP compliance with the Bankruptcy Code.

89. The debtors have not yet filed schedules or statements of financial affairs, which are due August 28, 2026. The Rule 2004 examination is necessary to enable Creditors to evaluate the debtors' financial affairs independently of the debtors' self-reporting.

## XVIII.
## EXHIBITS

90. Attached to this declaration are the following documents, each of which is a true and correct copy of the original: Exhibit A, the state court's August 20, 2026 severance and abatement order entered in Cause No. DC-25-05848; and Exhibit B, the docket sheet for Cause No. DC-25-05848 in the 162nd Judicial District Court of Dallas County, Texas.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 25, 2026.

Signed by:
Derek Gove
17183C448021401...

/s/ Derek Gove
Derek Gove 8/25/2026

Dated: August 25, 2026

Respectfully Submitted,

CM LAW, LLP

By: /s/ Richard Grant
Richard G. Grant
Tex. Bar No. 08302650

National Litigation Support Center
13101 Preston Road, Suite 110-1510
Dallas, Texas 75240
Telephone: 214-210-2929
Email: rgrant@cm.law

ATTORNEYS FOR TED VENTURES, LLC and TREND MEDICAL MANAGEMENT, LLC

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he has transmitted a true and correct copy of the foregoing (a) via the Court's Electronic Case Filing system to all persons participating therein on August 25, 2026; and (b) via United States First Class Mail, postage prepaid, on August 25, 2026 to each of the mailing addresses indicated on the service list attached hereto.

/s/ Richard Grant
Richard G. Grant